# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JESSE WILLARD, | Case No.: 1:19-cv-01074-AWI-SAB (PC) |
| Plaintiff, | |
| v. | FINDINGS AND RECOMMENDATION RECOMMENDING DISMISSAL OF ACTION |
| CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION, et.al., | [ECF No. 17] |
| Defendants. | |

Plaintiff Jesse Willard is appearing *pro se* in this civil rights action pursuant to 42 U.S.C. § 1983. This matter was referred to a United States Magistrate Judge pursuant to 28 U.S.C. § 636(1)(B) and Local Rule 302.

**I.**

**INTRODUCTION**

On September 13, 2019, the Court screened Plaintiff's complaint and found that he had not stated any cognizable claim. (ECF No. 17.) Plaintiff was granted leave to amend his complaint allegations within thirty days to attempt to cure the deficiencies identified in that order. Id.

Plaintiff failed to comply with or otherwise respond to the Court's order and the deadline to do so has now passed. Accordingly, the Court recommends dismissal of this action for the reasons discussed below.

1

## II.

## FAILURE TO STATE A CLAIM

The Court is required to screen complaints brought by prisoners seeking relief against a governmental entity or officer or employee of a governmental entity. 28 U.S.C. § 1915A(a). The Court must dismiss a complaint or portion thereof if the prisoner has raised claims that are legally "frivolous or malicious," that "fail[] to state a claim on which relief may be granted," or that "seek[] monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B).

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief. . . ." Fed. R. Civ. P. 8(a)(2). Detailed factual allegations are not required, but "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)). Moreover, Plaintiff must demonstrate that each defendant personally participated in the deprivation of Plaintiff's rights. Jones v. Williams, 297 F.3d 930, 934 (9th Cir. 2002).

Prisoners proceeding pro se in civil rights actions are entitled to have their pleadings liberally construed and to have any doubt resolved in their favor. Wilhelm v. Rotman, 680 F.3d 1113, 1121 (9th Cir. 2012) (citations omitted). To survive screening, Plaintiff's claims must be facially plausible, which requires sufficient factual detail to allow the Court to reasonably infer that each named defendant is liable for the misconduct alleged. Iqbal, 556 U.S. at 678-79; Moss v. U.S. Secret Service, 572 F.3d 962, 969 (9th Cir. 2009). The "sheer possibility that a defendant has acted unlawfully" is not sufficient, and "facts that are 'merely consistent with' a defendant's liability" falls short of satisfying the plausibility standard. Iqbal, 556 U.S. at 678; Moss, 572 F.3d at 969.

### A.  Complaint Allegations

Plaintiff sets forth numerous claims arising from events that took place while he was housed at Pelican Bay State Prison (PBSP) and California State Prison-Corcoran (CSP-COR).[1]

---

[1] The Court will not summarize the facts alleged to have taken place while Plaintiff was housed at CSP-COR, as the allegations which allegedly took place while he was at PBSP occurred outside this District and, as explained below, must be raised in the United States District Court for the Northern District of California.

In March 2011, Plaintiff arrived at CSP-COR for the first time. Between then and the time of filing the instant complaint, Plaintiff has transferred to and from three different times. CSP-COR is the central hub for the housing of homosexual inmates.

In March 2011, Plaintiff was housed in building Z on yard B at CSP-COR. He was abruptly moved to building 5. Plaintiff was unaware at the time that the officers who worked in building 5 had a special interest in overseeing homosexual inmates. Specifically a lead officer who had worked in the California Youth Authority. Plaintiff was called to the podium after placing his property in the cell he was assigned. The lead officer began to list the "rules." Plaintiff questioned one of the rules and the officer stated, "I know how to deal with your kind." Over the next few months, Plaintiff was targeted by frequent "raid-like" cell searches. Often certain officers would peek into his cell during sleeping hours. At yard release, he was subjected to over zealous body searches and eventually peculiar comments were made by staff.

In one instance, after Plaintiff was involved in a cell fight, the officer working the control tower stated, "What was that about? Domestic violence, huh?" Plaintiff ignored it. A couple days later while Plaintiff was on his way to a visit the officer stated, "Did you put on any blush." Plaintiff told him to "not ever speak to me like that." A few days later after leaving the education department, Plaintiff said hello to an officer working the observation tower, who responded "[y]ou are in it for shits and grins." Plaintiff later learned this statement was a homosexual reference.

On November 11, 2011, Plaintiff was placed in administrative segregation for disciplinary purposes. Plaintiff believes that staff had already begun to spread the rumor throughout the facility that he was homosexual, and they began to refer to Plaintiff as "Booty." After Plaintiff was placed in his cell, he had to wait nine hours to receive his bedding, clothes, and towels. While Plaintiff was housed in administrative segregation, officers attempted to have Plaintiff cell with men they knew participated in sexually perverse acts. Plaintiff was housed next to a homosexual and a transgender inmate was housed in the cell directly beneath. When Plaintiff sought medical care for an irritated scalp, they gave him "lubricant." Plaintiff's meals were served on a tray with "booty boy" carved into it.

///

Plaintiff's disciplinary issue was referred to the Kings County Superior Court. The district attorney filed charges in December 2011. Plaintiff was given a sentence three times the average to "teach" him a lesson. In June 2018, Plaintiff appeared in the same court for a new charge. At the first meeting, the court appeared attorney stated, "you keep putting your booty on the line."

Plaintiff was moved to the main administrative segregation unit building in February. Plaintiff immediately noticed odd behavior by staff. Plaintiff usually received his lunch in a brown bag with missing items. On one occasion, the sergeant stated, "I am going to put an 'S' on your jacket." S is a label for a sexual deviant. Plaintiff responded, "You'd better not put that on me. I am no pervert."

In March 2011, Plaintiff was moved to the security housing unit. One of the officers issuing Plaintiff's personal property handed him a shampoo bottle and stated, "I better not find this rammed up your ass." Plaintiff later discovered that the inmate he was housed with was there for exposing himself and masturbating to staff. Plaintiff was later sent across the street to another institution, but was returned to CSP-COR due to a realignment of housing mental health inmates.

On January 29, 2017, Plaintiff returned to CSP-COR, 4 A yard, for disciplinary reasons. Plaintiff was housed in building ZR. Upon his arrival, sergeant Perez stated, "You've been here before, right?" When Plaintiff asked for a jumpsuit, Perez responded, "Shut up! If you have a question, there is a chain of command," to which Plaintiff stated, "No. I am not going to shut up!" Perez approached the cell and threatened to go in. Plaintiff informed Perez he could assault him but he "would not shut up." Perez stated, "That's okay. You're going to my yard anyway." The moment Plaintiff arrived in building ZR, the adversity began. During mealtime, the officer passing out trays would tell Plaintiff "[t]hey forgot yours. I'll have to call the kitchen[,]" or "[t]hey forgot yours. I'll have to get one from next door." At first, Plaintiff would receive his meals about forty-five minutes after everyone else and it was cold. Then, he began to receive food trays with a strong odor. On one occasion, Plaintiff received a tray with nothing but bread and lettuce. The officer stated, "You're a vegetarian right[,]" and laughed. On two occasions, Plaintiff received his food trays with feces in it. He thereafter stopped accepting the meals. At the same time that his meals were being tampered with, his institutional and personal mail was being inhibited. When Plaintiff attempted to contact the mailroom, the lead guard responded that the books he ordered were "lost" three times and that he

4

forwarded the inquiry to the mail room. An officer told Plaintiff that "[t]hey are putting bug spray in your food."

In March 2017, while Plaintiff was housed at CSP-COR in the administrative segregation unit, he was doing pull-ups and heard an audible snap and a physical thump near his left clavicle and left scapula simultaneously. Plaintiff completed the exercise but decided to take time off. Approximately a week later, Plaintiff began to experience severe pain in his neck, chest, shoulders, and upper-arm on his left side. Plaintiff noticed his clavicle was protruding where it meets the sternum. Plaintiff requested to see a nurse. Three hours later, Plaintiff was escorted from his cell to a holding cell in the rotunda building. A women in medical attire introduced herself as a "psyche technician" and asked him to detail the issue. She instructed Plaintiff to put in a "sick call slip" because she did not want to radio "man-down." Plaintiff was then returned to his cell with no aid.

On the following morning, Plaintiff sought medical treatment. On April 17, 2017, Plaintiff saw a registered nurse and described the issue. The protruding clavicle was noted, and he was sent for an x-ray.

On April 18, 2017, Dr. Gill informed Plaintiff that the x-ray was normal and there was no follow-up needed. Plaintiff saw a registered nurse again around May or June 2017, and the nurse suggested that he was "faking."

Plaintiff filed an inmate grievance in April. Plaintiff had proof that his books had reached the prison and proof of forged documents. Plaintiff was interviewed at the first level by sergeant Morrow. During the interview, it became clear that Morrow either turned a blind eye to the misconduct or was involved, and he refused to review the documents. After the grievance was denied, Plaintiff submitted it to the second level review. However, the grievance ultimately disappeared, and when he wrote to the appeals office he was advised that it was never resubmitted. Around this time, Plaintiff began to seek medical care for an injury. It was crystal clear that the medical staff were ordered not to provide care. Plaintiff continued not to accept the "poisoned" food trays.

On July 2, 2017, Plaintiff was moved to building 4R. When Plaintiff received his first breakfast tray, he noticed the chemical smell and poured it into the toilet. When officer Salcedo picked up the tray he smiled and said, "Was everything good?" Sometime later, Plaintiff was served a

5

lunch with cheese slices and one of them was mostly covered in blood. Plaintiff examined the wrapper and discovered it had not been opened. However, upon further inspection, he discovered a needle size hole.

In approximately the third week of July, Plaintiff had an interview with a lieutenant. Plaintiff explained the issues, and he stated, "Sounds like you are just 'bitching.' I'm going to be honest with you. You are not going to get any help from in here. Your best bet would be to get an outside entity." It became immediately evidence that the culture of staff misconduct was a known affair and common practice among staff.

On August 4, 2017, Plaintiff was transferred back to the facility across the street. When he arrived, Plaintiff discovered that CSP-COR had "lost" his personal property. Plaintiff filed a grievance, but did not receive his property until two months later.

On September 18, 2017, Plaintiff saw registered nurse Lindsey, at California Substance Abuse and Treatment Facility and State Prison, who assessed the situation and noted a "slight asymmetry at the left clavicle when compared to the right." Plaintiff was referred to a doctor. However, Plaintiff was transferred back to CSP-COR for disciplinary reasons before the follow-up appointment.

On November 29, 2017, Plaintiff returned to CSP-COR for disciplinary reasons and housed in 4A yard, building 4L. Plaintiff did not know any of the officers and did not expect the "torture" to continue. Through the months of December 2017 to June 2018 the following took place:

> While serving breakfast, Officer Shelby often claimed to have forgotten my milk or my entire meal. He regularly stated that he had to go next door to get it. (It became known to me that each time I was told, "They forgot your meal. We have to go and get it next door," the staff had pre-arranged for someone to add harmful substances to my food. In some cases, blood, feces, and other bodily substances, but usually "bug spray." This same officer came to work one morning with a bunch of huge bananas he brought from home. He and officer Salcedo made a show of pulling the bananas from beneath the car. Officer Salcedo said, "We bet on which you'd choose. A banana or an apple. I bet you want a banana."
>
> Officer Shelby frequently made comments about "throwing your back out." During [an] escort he began to talk about bug spray. "I heard you could use the stuff to clean gunk from your headlights. Wow! Imagine what it's doing to your body." Around this time, I noticed my skin and scalp became irritated. My stomach ached, my urine was cloudy, and I had sores inside my nostrils. I also had trouble walking or standing and my knees were stiff and in great pain I notified the medical staff. Rather than receive any care, they informed the guards of my

medical concerns. Also, a psych-technician came to my cell and attempted to make it a "mental health" delusion.

Officer Juardo, during escorts, would sing songs such as, "Back that thang up", I want a man", "All the bustas who are soft, you can do it out your back into it." He once stopped in front of my cell, turned around, and began "twerking". Officer Flores, while speaking to me about whom I'd cell with suggested anyone would be acceptable who was gay. He also suggested that I had enemy/safety concerns. The lead officer on 3rd watch waited until he got by my door and shouted, "hey girl." This officer and another made a comment suggesting that I "liked to masturbate while watching other inmates shower". By this time, I had confronted several officers and made it clear that I was not a homosexual. New officers I had never met began to work in the building. They made comments such as "I see dead people", "You like the walking dead?" I did not understand these comments. I was supposed to be transferred to North Kern State Prison, but the counselor in collaboration with the guards managed to have my transfer changed to Pelican Bay in hopes that something terrible would happen to me.

I stopped accepting meals in totality and filed a grievance for staff misconduct and sexual harassment in April 2018. It was rejected. I was asked to provide details. I did and resubmitted, but it once again vanished.

My confrontation with staff increased as "booty" comments increased. I wrote to the counselor and received no response. Though I was going to court in Kings County, I was abruptly transferred to Pelican Bay in May 2018.

Plaintiff returned to CSP-COR for Court on July 2, 2018. Plaintiff was housed on 4A yard in building ZR, and he remained there until August 20, 2018. During this time, Plaintiff's mail was inhibited by officer Mecum. His meals also continued to be tampered with and tainted, and all officers in the yard began to participate. During a medical appointment, one of the escorting officers stated, "[w]hen you have penned up homosexual urges, you're angry all the time. You can just let it out. No one will judge you." Plaintiff confronted him and he claimed to have been directing it to someone else. I spoke to second watch officer Alvarez and expressed his issues. Plaintiff also asked a psyche-tech for advice. Plaintiff filed a new grievance and it was rejected four times stating he had to give names. Plaintiff pointed out that the regulations which stated that a complaint could be filed without names if the details made identification possible. Ultimately, the grievance was cancelled. Plaintiff suffered the harassment between 2011 and 2018, and it has caused him a great deal of physical and mental anguish.

///

///

7

In the last week of December 2017, Plaintiff began to experience severe pain throughout his neck, shoulder and back. He also began to have a tingling and numbing sensation in his left arm, face, and top of head which caused blurred vision.

On January 28, 2018, Plaintiff explained in detail his issues and requested an M.R.I, to Registered Nurse, Doughtery. However, Doughtery made a note that there were "no abnormalities" contradicting the assessment of Registered Nurse Lindsey.

On March 20, 2018, x-rays were conducted.

On April 4, 2018, Plaintiff had an interview with Doughtery regarding his health care appeal. The nurse showed little interest in Plaintiff's situation. Doughtery suggested that the length of Plaintiff's hair and excessive exercise were the cause of his ailment. Plaintiff was not provided an examination and his appeal was denied.

On April 12, 2018, Plaintiff submitted a health care request form. Around this time, Plaintiff was examined by Dr. Gill who noted the protruding clavicle, but instructed Plaintiff to go back when he lost at least partial function and advised him to cut down on exercise.

On April 17, 2018, April 23, 2018, and May 23, 2018, Plaintiff submitted health care request forms.

On May 25, 2018, Registered Nurse Holt noted the lump to the left clavicle area and referred Plaintiff to a doctor. Plaintiff was thereafter transferred to Pelican Bay State Prison.

On July 22, 2018, after Plaintiff's return to CSP-COR, he submitted another health care request form.

On July 24, 2018, Registered Nurse Holt noted Plaintiff's left scapula appeared larger than the right and referred him to a doctor.

On August 6, 2018, Dr. Hitchman noted the prominence of his left sterno-clavicle joint, but stated it was common. In contrast, Dr. Williams examined at Pelican Bay State Prison, Dr. Hitchman indicated that the range of motion was normal. Dr. Hitchman's opinion was "simply tendinitis from repetitive movements." No follow-up was ordered. Dr. Hitchman told Plaintiff, "to be frank, the state is not going to pay $10,000 for an M.R.I. unless you have total loss of function." Plaintiff was transferred back to Pelican Bay State Prison on August 22, 2018.

**B.     Eleventh Amendment**

The Eleventh Amendment bars federal jurisdiction over suits by individuals against a State and its instrumentalities, unless either the State consents to waive its sovereign immunity or Congress abrogates it. Pennhurst State School & Hosp. v. Halderman, 465 U.S. 89, 99-100 (1984). To overcome the Eleventh Amendment bar, the State's consent or Congress' intent must be "unequivocally expressed." Id. at 99. Although California has consented to be sued in its own courts under the California Torts Claims Act, the consent does not extend to suits in federal court. See BV Engineering v. Univ. of Cal., Los Angeles, 858 F.2d 1394, 1396 (9th Cir. 1988). Here, the California Department of Corrections and Rehabilitation (CDCR), PBSP, and CSP-COR are all state agencies that are immune from civil rights claims under section 1983. Pennhurst, 465 U.S. at 100 ("This jurisdictional bar applies regardless of the nature of the relief sought."); Alabama v. Pugh, 438 U.S. 781, 782 (1978) (per curiam) (the Eleventh Amendment bars claim for injunctive relief against State of Alabama and its Board of Corrections). Brown v. California Dep't of Corr., 554 F.3d 747, 752 (9th Cir. 2009); Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989). Accordingly, Plaintiff's claims against Defendants CDCR, PBSP, and CSP-COR are subject to dismissal as barred by the Eleventh Amendment.

**C.     Statute of Limitation**

Failure to comply with the applicable statute of limitations may be grounds for dismissal at the screening stage if it apparent from the face of the complaint that plaintiff cannot "prevail, as a matter of law, on the equitable tolling issue." Cervantes v. City of San Diego, 5 F.3d 1273, 1276 (9th Cir. 1993).

Federal law determines when a claim accrues, and "[u]nder federal law, a claim accrues when the plaintiff knows or should know of the injury that is the basis of the cause of action." Douglas v. Noelle, 567 F.3d 1103, 1109 (9th Cir. 2009) (citation omitted); Maldonado v. Harris, 370 F.3d 945, 955 (9th Cir. 2004); Fink v. Shedler, 192 F.3d 911, 914 (9th Cir. 1999). Because section 1983 contains no specific statute of limitations, federal courts should apply the forum state's statute of limitations for personal injury actions. Jones v. Blanas, 393 F.3d 918, 927 (9th Cir. 2004); Maldonado, 370 F.3d at 954; Fink, 192 F.3d at 914. California's statute of limitations for personal injury actions was extended to two years effective January 1, 2003. Cal. Civ. Proc. Code ' 335.1; Jones, 393 F.3d at 927; Maldonado, 370 F.3d at 954-55.

In actions where the federal court borrows the state statute of limitations, courts should also borrow all applicable provisions for tolling the limitations period found in state law. Jones, 393 F.3d at 927. This applies to both statutory and equitable tolling. See Jones v. Blanas, 393 F.3d 918, 927 (9th Cir. 2004) ("For actions under 42 U.S.C. § 1983, courts apply the forum state's statute of limitations for personal injury actions, along with the forum state's law regarding tolling, including equitable tolling, except to the extent any of these laws is inconsistent with federal law.") Section 352.1 of the California Code of Civil procedure allows for the tolling of the statute of limitations during a period of "disability" while the plaintiff is in state prison, and the tolling may not exceed two years. Incarceration can toll the statute of limitations for a maximum of two years, unless the inmate-plaintiff is serving a life sentence without the possibility of parole. Cal. Civ. Proc. Code § 352.1 (tolling applies to prisoners sentenced to "a term less than for life"); Brooks v. Mercy Hosp., 1 Cal.App.5th 1, 6-7 (2016) (tolling provision construed "to mean that only those sentenced to life without the possibility of parole should be excluded from the tolling provision.") However, section 352.1 does not apply to an individual who, such as Plaintiff, would is in pretrial custody in a county jail at the time his claims accrued because he is not "imprisoned on a criminal charge" within the meaning of section 352.1. Austin v. Medicis, 21 Cal.App.5th 577, 597 (Cal. Ct. App. 2018), reh'g denied (Apr. 11, 2018), review denied (June 13, 2018); see also Groce v. Claudat, 603 F. App'x 581, 582 (9th Cir. 2015) (§ 352.1 inapplicable where plaintiff "was not incarcerated when his claims accrued"); Shaw v. Sacramento County Sheriff's Department, 343 F.Supp.3d 919, 924 (E.D. Cal. 2018); (discussing holding in Austin and finding the plaintiff was not serving a prison sentence upon his arrest and subsequent time in county jail); McCain v. Brosowke, No. EDCV 17-2377 MWF (SS), 2018 WL 1918533, at *3-4 (C.D. Cal. Apr. 20, 2018) (same).

"Equitable tolling under California law 'operates independently of the literal working of the Code of Civil Procedure to suspend or extend a statute of limitations as necessary to ensure fundamental practicality and fairness." Jones, 393 F.3d at 928 (quoting Lantzy v. Centex Homes, 31 Cal.4th 363, 370 (2003)). "Under California law, a plaintiff must meet three conditions to equitably toll a statute of limitations: (1) defendant must have had timely notice of the claim; (2) defendant must not be prejudiced by being required to defend the otherwise barred claim; and (3) plaintiff's conduct

must have been reasonable and in good faith." Fink, 192 F.3d at 916 (internal quotation marks and citation omitted).

Accordingly to the allegations in the complaint, Plaintiff contends that he arrived at CSP-COR in March 2011, in which some of the alleged incidents began. Plaintiff filed the instant complaint in May 2019, and it appears that any claims arising in 2011 are barred by the statute of limitations which are subject to dismissal.

**D.     Cruel and Unusual Punishment/Failure to Protect**

The Eighth Amendment's prohibition against cruel and unusual punishment protects prisoners not only from inhumane methods of punishment but also from inhumane conditions of confinement. Morgan v. Morgensen, 465 F.3d 1041, 1045 (9th Cir. 2006) (citing Farmer v. Brennan, 511 U.S. 825, 847 (1994) and Rhodes v. Chapman, 452 U.S. 337, 347 (1981)) (quotation marks omitted). While conditions of confinement may be, and often are, restrictive and harsh, they must not involve the wanton and unnecessary infliction of pain. Morgan v. Morgensen, 465 F.3d at 1045 (citing Rhodes v. Chapman, 452 U.S. at 347) (quotation marks omitted). Thus, conditions which are devoid of legitimate penological purpose or contrary to evolving standards of decency that mark the progress of a maturing society violate the Eighth Amendment. Morgan v. Morgensen, 465 F.3d at 1045 (quotation marks and citations omitted); Hope v. Pelzer, 536 U.S. 730, 737 (2002); Rhodes v. Chapman, 452 U.S. at 346.

Prison officials have a duty to ensure that prisoners are provided adequate shelter, food, clothing, sanitation, medical care, and personal safety, Johnson v. Lewis, 217 F.3d 726, 731 (9th Cir. 2000) (quotation marks and citations omitted), but not every injury that a prisoner sustains while in prison represents a constitutional violation, Morgan v. Morgensen, 465 F.3d at 1045 (quotation marks omitted). To maintain an Eighth Amendment claim, a prisoner must show that prison officials were deliberately indifferent to a substantial risk of harm to his health or safety. Farmer v. Brennan, 511 U.S. at 847; Thomas v. Ponder, 611 F.3d 1144, 1150-51 (9th Cir. 2010); Foster v. Runnels, 554 F.3d 807, 812-14 (9th Cir. 2009); Morgan v. Morgensen, 465 F.3d at 1045; Johnson v. Lewis, 217 F.3d at 731; Frost v. Agnos, 152 F.3d 1124, 1128 (9th Cir. 1998).

///

In Rhodes, the Supreme Court found that in order to state an Eighth Amendment claim, the conditions must "inflict[] unnecessary or wanton pain or is grossly disproportionate to the severity of crimes warranting imprisonment." Rhodes v. Chapman, 452 U.S. at 348-49. The Court cautioned against finding violations based upon "an aspiration toward an ideal environment for long-term confinement." Id. In addition, the Constitution does not mandate comfortable prisons. Id.

Plaintiff contends that Defendants were deliberately indifferent to his safety by labeling him a homosexual and spreading the information around. However, Plaintiff has failed to provide anything more than a mere allegation that he was generally labeled a homosexual. In addition, Plaintiff has failed to state any facts to show that any Defendant's conduct caused Plaintiff actual injury. Indeed, Plaintiff alleges nothing more than that Defendants made general derogatory comments about him being homosexual and housed him with other homosexual inmates. Accordingly, Plaintiff fails to state a cognizable claim under the Eight Amendment.

### E.  Conditions of Confinement/Food Contamination

"Prison official have a duty to ensure that prisoners are provided adequate shelter, food, clothing, sanitation, medical care, and personal safety. The circumstances, nature, and duration of a deprivation of these necessities must be considered in determining whether a constitutional violation has occurred. The more basic the need, the shorter the time it can be withheld. Johnson v. Lewis, 217 F.3d at 731-32 (citations and internal quotation marks omitted). "The Eighth Amendment requires only that prisoner receive food that is adequate to maintain health; it need not be tasty or aesthetically pleasing." LeMaire v. Maass, 12 F.3d 1444, 1456 (9th Cir. 1993) (citation omitted). "The fact that the food occasionally contains foreign objects…while unpleasant, does not amount to a constitutional deprivation." Id. (citation and internal quotation marks omitted). However, "[p]reventing disease and protecting the health of inmates are legitimate penological goals." McClure v. Tucker, 276 Fed. Appx. 574, 575 (9th Cir. 2008).

Here, Plaintiff has alleged nothing more than isolated and sporadic claims of contaminated food, which is insufficient to state a cognizable constitutional claim under the Eighth Amendment. See, e.g., Islam v. Jackson, 782 F.Supp. 1111, 1114-15 (E.D. Va. 1992) (serving one meal contaminated with maggots and meals under unsanitary conditions for thirteen days was not cruel and

unusual punishment, even though inmate suffered symptoms of food poisoning on one occasion); Bennett v. Misner, No. Civ 02-1662-HA, 2004 WL 2091473, at *20 (D. Or. Sept. 17, 2004) ("Neither isolated instances of food poisoning, temporary lapses in sanitary food service, nor service of meals contaminated with maggots are sufficiently serious to constitute an Eighth Amendment violation.") Accordingly, Plaintiff fails to state a cognizable claim.

### F. Deliberate Indifference to Serious Medical Need

While Plaintiff is entitled to medical care while incarcerated, the Eighth Amendment is violated only when a prison official acts with deliberate indifference to an inmate's serious medical needs. Snow v. McDaniel, 681 F.3d 978, 985 (9th Cir. 2012), overruled in part on other grounds, Peralta v. Dillard, 744 F.3d 1076, 1082-83 (9th Cir. 2014); Wilhelm, 680 F.3d at 1122; Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006). To state a claim a plaintiff "must show (1) a serious medical need by demonstrating that failure to treat [his] condition could result in further significant injury or the unnecessary and wanton infliction of pain," and (2) that "the defendant's response to the need was deliberately indifferent." Wilhelm, 680 F.3d at 1122 (citing Jett, 439 F.3d at 1096). "Deliberate indifference is a high legal standard," Simmons, 609 F.3d at 1019; Toguchi v. Chung, 391 F.3d 1051, 1060 (9th Cir. 2004), and is shown by "(a) a purposeful act or failure to respond to a prisoner's pain or possible medical need, and (b) harm caused by the indifference." Wilhelm, 680 F.3d at 1122 (citing Jett, 439 F.3d at 1096). The requisite state of mind is one of subjective recklessness, which entails more than ordinary lack of due care. Snow, 681 F.3d at 985 (citation and quotation marks omitted); Wilhelm, 680 F.3d at 1122.

Mere 'indifference,' 'negligence,' or 'medical malpractice' will not support this cause of action." Broughton v. Cutter Laboratories, 622 F.2d 458, 460 (9th Cir. 1980) (citing Estelle v. Gamble, 429 U.S. 97, 105-06 (1976)). "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." Estelle, 429 U.S. at 106; Snow, 681 F.3d at 987-88; Wilhelm, 680 F.3d at 1122 ("The deliberate indifference doctrine is limited in scope.").

Further, "[a] difference of opinion between a physician and the prisoner—or between medical professionals—concerning what medical care is appropriate does not amount to deliberate indifference." Snow, 681 F.3d at 987 (citing Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989)); Wilhelm, 680 F.3d at 1122-23 (citing Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1986)). Rather, a plaintiff is required

to show that the course of treatment selected was "medically unacceptable under the circumstances" and that the defendant "chose this course in conscious disregard of an excessive risk to plaintiff's health." Snow, 681 F.3d at 988 (quoting Jackson, 90 F.3d at 332).

Here, Plaintiff alleges nothing more than a disagreement of the proper course of treatment among physicians, which is not cognizable under the Eighth Amendment. Plaintiff acknowledges that he was evaluated by a doctor and provided an x-ray. Although Plaintiff contends that Dr. Hitchman told him the state would not pay for an M.R.I. unless there was total loss of function, fails to give rise to a claim of deliberate indifference because there are no facts to suggest that Dr. Hitchman believed an M.R.I. was necessary given he upon examination he noted the prominence of left sterno-clavicle joint which was common. Accordingly, Plaintiff fails to state a cognizable claim for deliberate indifference.

**G.     First Amendment Right to Send and Receive Mail**

Prisoners have "a First Amendment right to send and receive mail." Witherow v. Paff, 52 F.3d 264, 265 (9th Cir. 1995) (per curiam). Nevertheless, correctional institutions and jails have a legitimate governmental interest in imposing certain restraints on inmate or detainee correspondence to maintain order and security. See Procunier v. Martinez, 416 U.S. 396, 413 (1974), overturned on other grounds by Thornburgh v. Abbott, 490 U.S. 401, 413–14 (1989). For example, inmates and detainees may have their mail screened to ensure that there is no contraband inside. Mangiaracina v. Penzone, 849 F.3d 1191, 1195 (9th Cir. 2017).

When incoming mail is legal mail, there are heightened concerns with allowing prison officials unfettered discretion in opening and reading an inmate's mail. Prisoners have a Sixth Amendment right to confer privately with counsel and the practice of opening legal mail in the prisoner's presence is specifically designed to protect that right. Id. at 1196–97 (Sixth Amendment requires a pretrial detainee be present when legal mail related to a criminal matter is inspected; even a single incident of improper reading of a pretrial detainee's mail may give rise to a constitutional violation); Hayes v. Idaho Corr. Ctr., 849 F.3d 1204, 1210 (9th Cir. 2017) (prisoners have a First Amendment right to have their properly marked legal mail, including civil mail, opened in their presence). "A criminal defendant's ability to communicate candidly and confidentially with his lawyer is essential to his defense." Id. at 1198

1  (quoting Nordstrom v. Ryan, 762 F.3d 903, 910 (9th Cir. 2014)). Prison officials may open and inspect, but not read, a prisoner's legal mail. Nordstrom v. Ryan, 762 F.3d 903 (9th Cir. 2014).

"Mail from the courts, as contrasted to mail from a prisoner's lawyer, is not legal mail." Keenan v. Hall, 83 F.3d 1083, 1094 (9th Cir. 1996). "All correspondence from a court to a litigant is a public document, which prison personnel could if they want inspect in the court's files." Id. at 1094 (citing to Martin v. Brewer, 830 F.2d 76, 78 (7th Cir. 1987)).

Interference with outgoing prisoner mail is justified under the First Amendment if the following criteria are met: (1) the regulation furthers "an important or substantial government interest unrelated to the suppression of expression" and (2) "the limitations of the First Amendment freedoms must be no greater than is necessary or essential to the protection of the particular governmental interest involved." Procunier v. Martinez, 416 U.S. at 412 (limited by Thornburgh v. Abbott, 490 U.S. at 413-14, only as test relates to incoming mail).

Here, Plaintiff alleges that at the same time his food was being tampered with, his mail was being "inhibited. Plaintiff contends that books he ordered were "lost" three times. However, Plaintiff is not entitled to relief for his claim that his property was negligently or intentionally lost or destroyed. Accordingly, Plaintiff fails to state a cognizable claim.

### H.  Confiscation/Loss/Damage Personal Property

The Due Process Clause of the Fourteenth Amendment of the United States Constitution protects Plaintiff from being deprived of property without due process of law, Wolff v. McDonnell, 418 U.S. 539, 556 (1974), and Plaintiff has a protected interest in his personal property, Hansen v. May, 502 F.2d 728, 730 (9th Cir. 1974). Authorized, intentional deprivations of property are actionable under the Due Process Clause, see Hudson v. Palmer, 468 U.S. 517, 532, n.13 (1984); Quick v. Jones, 754 F.2d 1521, 1524 (9th Cir. 1985), but the Due Process Clause is violated only when the agency "prescribes and enforces forfeitures of property without underlying statutory authority and competent procedural protections," Nevada Dept. of Corrections v. Greene, 648 F.3d 1014, 1019 (9th Cir. 2011) (citing Vance v. Barrett, 345 F.3d 1083, 1090 (9th Cir. 2003)) (internal quotations omitted). The Due Process Clause is not violated by the random, unauthorized deprivation of property so long as the state provides an adequate post-deprivation remedy. Hudson v. Palmer, 468 U.S. 517, 533 (1984);

Barnett v. Centoni, 31 F.3d 813, 816-17 (9th Cir. 1994). Here, Plaintiff alleges an unauthorized taking of his property which is not actionable under the Due Process Clause because California provides an adequate post-deprivation remedy. Barnett v. Centoni, 31 F.3d at 816-17 (citing Cal. Gov't Code §§810-895).

### I. Transfer to Different Prison Facility

Prison inmates do not have a constitutional right to be incarcerated at a particular correctional facility or to be transferred from one facility to another. Meachum v. Fano, 427 U.S. 215, 224-25 (1976); see also Olim v. Wakinekona, 461 U.S. 238, 244-45 (1983).

### J. Verbal Abuse and/or Threats

Throughout his complaint, Plaintiff alleges that prison officials verbally abused, threatened, and harassed him. However, threats or verbal harassment do not rise to the level of a constitutional violation and, thus, do not give rise to a claim for relief under § 1983. Gaut v. Sunn, 810 F.2d 923, 925 (9th Cir. 1987); Oltarzewski v. Ruggiero, 830 F.2d 136, 139 (9th Cir. 1987). Accordingly, Plaintiff fails to state a cognizable claim based on any alleged verbal abuse, threats, and harassment.

### K. Loss of Privileges

Courts generally agree that the temporary loss of privileges or the loss of a prisoner job does not give rise to a deprivation of a liberty or property interest. See, e.g., Walker v. Gomez, 370 F.3d 969, 973 (9th Cir. 2004) (prisoner does not have a property or liberty interest in prison employment); Davis v. Small, 595 F. App'x 689, 691 (9th Cir. 2014) (no protected liberty interest in a paying prison job or particular phone and yard privileges). Plaintiff also does not have a liberty or property interest in his classification score. See Myron v. Terhune, 476 F.3d 716, 718 (9th Cir. 2007) (a raised classification score does not implicate a state-created liberty interest).

### L. Challenge to Criminal Case/Sentence

It has long been established that state prisoners cannot challenge the fact or duration of their confinement in a section 1983 action and their sole remedy lies in habeas corpus relief. Wilkinson v. Dotson, 544 U.S. 74, 78 (2005). Often referred to as the favorable termination rule or the Heck bar, this exception to section 1983's otherwise broad scope applies whenever state prisoners "seek to invalidate the duration of their confinement-either directly through an injunction compelling speedier

release or indirectly through a judicial determination that necessarily implies the unlawfulness of the State's custody." Wilkinson, 544 U.S. at 81; Heck v. Humphrey, 512 U.S. 477, 482, 486-487 (1994); Edwards v. Balisok, 520 U.S. 641, 644 (1997). Thus, "a state prisoner's [section] 1983 action is barred (absent prior invalidation)-no matter the relief sought (damages or equitable relief), no matter the target of the prisoner's suit (state conduct leading to conviction or internal prison proceedings)-if success in that action would necessarily demonstrate the invalidity of confinement or its duration." Id. at 81-82. Accordingly, any challenge to Plaintiff's criminal conviction and/or sentence must be raised by way of habeas corpus petition.

## V.

## FAILURE TO OBEY COURT ORDER

As noted above, on September 13, 2019, the Court screened Plaintiff's complaint and found that he had not stated any cognizable claims. (ECF N0. 17.) Plaintiff was granted leave to amend his complaint allegations within thirty days to attempt to cure the deficiencies identified in that order. Id. Plaintiff failed to comply with or otherwise respond to the Court's order and the deadline to do so has now passed. The Court's September 13, 2019, order specifically warned that if Plaintiff failed to file an amended complaint in compliance with the order, the Court would recommend to a district judge that this action be dismissed consistent with the reasons stated in the order. Id.

Based on Plaintiff's failure to comply with or otherwise respond to the Court's order, the Court is left with no alternative but to dismiss the action for failure to prosecute, failure to obey a court order, and failure to state a cognizable claim for relief. Id. This action can proceed no further without Plaintiff's cooperation and compliance with the orders at issue, and the action cannot simply remain idle on the Court's docket, unprosecuted. Id.

The Court has the inherent power to control its docket and may, in the exercise of that power, impose sanctions where appropriate, including dismissal of the action. Bautista v. Los Angeles Cnty., 216 F.3d 837, 841 (9th Cir. 2000). In determining whether to dismiss an action, the Court must weigh "(1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its docket; (3) the risk of prejudice to the defendants; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions." In re Phenylpropanolamine (PPA) Prod. Liab.

Litig., 460 F.3d 1217, 1226 (9th Cir. 2006) (internal quotations and citations omitted). These factors guide a court in deciding what to do, and are not conditions that must be met in order for a court to take action. Id. (citation omitted).

Based on Plaintiff's failure to comply with or otherwise respond to the Court's order, the Court is left with no alternative but to recommendation dismissal of the action for failure to prosecute. Id. This action can proceed no further without Plaintiff's cooperation and compliance with the order at issue, and the action cannot simply remain idle on the Court's docket, unprosecuted. Id. Further, there is no pleading on file which sets forth any claims upon which relief may be granted.

## VI.
## CONCLUSION AND RECOMMENDATION

Accordingly, it is HEREBY RECOMMENDED that the instant action be dismissed based on Plaintiff's failure to comply with a court order, failure to prosecute, and for failure state a claim upon which relief may be granted under section 1983.

This Findings and Recommendation will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l). Within **twenty-one (21)** days after being served with this Findings and Recommendation, Plaintiff may file written objections with the Court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Plaintiff is advised that failure to file objections within the specified time may result in the waiver of rights on appeal. Wilkerson v. Wheeler, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated: **October 29, 2019**

UNITED STATES MAGISTRATE JUDGE